Slip Op. 18-12

UNITED STATES COURT OF INTERNATIONALTRADE

| | |
|---|---|
| ARKEMA, INC., THE CHEMOURS COMPANY FC, LLC, HONEYWELL INTERNATIONAL INC., <br><br>  Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>  Defendant. | **PUBLIC VERSION** <br><br> Before: Leo M. Gordon, Judge <br><br> Court No. 16-00179 |

**OPINION and ORDER**

[Final material injury determination sustained in part, and remanded in part to the ITC.]

Dated: February 16, 2018

   James R. Cannon, Jr., Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for the Plaintiffs Arkema, Inc., The Chemours Company FC, LLC, Honeywell International Inc. and Plaintiff-Intervenor The American HFC Coalition. With him on the brief were Jonathan M. Zielinski and Nina R. Tandon.

   Patrick V. Gallagher, Jr., Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for Defendant United States. With him on the brief were Dominic L. Bianchi, General Counsel, and Andrea C. Casson, Assistant General Counsel for Litigation.

   Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, argued for Defendant-Intervenors Shandong Dongyue Chemical Co. Ltd., Zhejiang Sanmei Chemical Ind. Co., Ltd., Sinochem Environmental Protection Chemicals Co., Ltd., and Zhejiang Quhua Fluor-Chemistry Co., Ltd. With him on the brief were Max F. Schutzman and Jordan C. Kahn.

   Frank Morgan, Trade Law Defense PLLC, of Alexandria, VA, argued for Defendant-Intervenor ICOR International Inc.

   Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, DC, argued for Defendant-Intervenor National Refrigerants, Inc. With him on the brief was Jonathan M. Freed.

      Gordon, Judge: This action involves the final affirmative material injury determination of the U.S. International Trade Commission ("ITC" or the "Commission") in the antidumping duty investigation covering hydrofluorocarbon ("HFC") blends and components from the People's Republic of China ("PRC"). See Hydrofluorocarbon Blends and Components from China, 81 Fed. Reg. 53,157 (Int'l Trade Comm'n Aug. 11, 2016) ("Final Determination"); see also Views of the Commission, USITC Pub. 4629, Inv. No. 731-TA-1279 (Final) (Aug. 2016), ECF No. 33-3 ("Views"); ITC Staff Report, Inv. No. 731-TA-1279 (July 8, 2016), as revised by Mem. INV-OO-062 (July 13, 2016), ECF Nos. 33-1 & 33-2 ("Staff Report").[1] Before the court is the USCIT Rule 56.2 motion for judgment on the agency record filed by Plaintiffs Arkema, Inc., The Chemours Company FC, LLC, Honeywell International Inc. and Plaintiff-Intervenor The American HFC Coalition (collectively, "Plaintiffs"). See Plaintiffs' Rule 56.2 Mot. J. Agency R., ECF No. 43 ("Pls.' Br."); see also Def. Int'l Trade Comm'n's Opp'n Pls.' Mot. J. Agency R., ECF No. 45 ("Def.'s Resp."); Pls.' Reply Br., ECF No. 60 ("Pls.' Reply Br."); Def.-Intervenors Shandong Dongyue Chemical Co. Ltd., Zhejiang Sanmei Chemical Ind. Co., Ltd., Sinochem Environmental Protection Chemicals Co., Ltd., and Zhejiang Quhua Fluor-Chemistry Co. Ltd.'s Opp'n Pls.' Mot. J. Agency R., ECF No. 50 ("Chinese Def.-Intervenors Resp."); Def.-Intervenor ICOR International Inc.'s Opp'n Pls.' Mot. J. Agency R., ECF No. 52; Def.-Intervenor National Refrigerants, Inc.'s Opp'n Pls.' Mot. J. Agency R., ECF No. 53 ("Nat'l Refrigerants Resp."). The court has jurisdiction pursuant

---

[1] All citations to the Views, the agency record, and the parties' briefs are to their confidential versions.

to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

## I.  Standard of Review

The court sustains the Commission's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Practice § 9.24[1] (3d ed. 2017). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2017).

## II. Discussion

In June 2015, after receiving a petition from Plaintiffs, the Commission commenced an investigation to determine whether imports of certain HFC blends and HFC components[3] from China were causing or threatening to cause material injury to the U.S. industry pursuant to 19 U.S.C. § 1673d(b). See Final Determination. In its preliminary determination, the Commission found the "domestic like product" at issue to be "a single domestic like product consisting of HFC blends and HFC components within Commerce's scope definition." See Views at 10; see also 19 U.S.C. § 1677(10) ("The term 'domestic like product' means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle."). Plaintiffs agreed with this finding, while Defendant-Intervenors argued that the Commission should instead find that HFC Blends and Components are two separate like products. See Views at 10–11. In its final determination, the Commission agreed with

---

[3] For purposes of the investigation and this opinion, "HFC Components" refer to three single component hydrofluorocarbons: R-32, R-125, and R-143a. "HFC Blends" include: R-404A, R-407A, R-407C, R- 410A, and R-507A—as these are the only five blends that included two or more of the HFC Components, or the out-of-scope component R-134a and at least one of the HFC Components. See Staff Report at I-10–I-12 (detailing scope of investigation of HFC blends and components); Pls.' Br. 10–11 (providing concise explanations for these definitions with references to the Staff Report).

Defendant-Intervenors and found HFC Blends and Components to be separate like products. The Commission also unanimously concluded that imports of HFC Blends from China were causing material injury to a U.S. industry, but that imports of HFC Components from China were not causing or threatening to cause material injury to a U.S. industry. See Final Determination. Plaintiffs challenge both the ITC's determination that HFC Blends and HFC Components are not a single like product, and that imports of the HFC Components are not causing or threatening to cause material injury to a U.S. industry. See Pls'. Br. at 1; Pls.' Reply Br. at 21–23.

In addressing the issue of whether HFC Blends and HFC Components are a single domestic like product or two separate like products, the Commission utilized its semi-finished products analysis. See Views at 13–14. "In a semi-finished product analysis, the Commission currently examines: (1) whether the upstream article is dedicated to the production of the downstream article or has independent uses; (2) whether there are perceived to be separate markets for the upstream and downstream articles; (3) differences in the physical characteristics and functions of the upstream and downstream articles; (4) differences in the costs or value of the vertically differentiated articles; and (5) significance and extent of the processes used to transform the upstream into the downstream articles." Id. at 14 n.40.

Plaintiffs challenge the Commission's application of the semi-finished products analysis as unreasonable given the record. Specifically, Plaintiffs challenge as unsupported by substantial evidence the Commission's findings as to the "dedicated for use," "differences in value," and "the significance and extent of transformation processes"

prongs, as well as the Commission's ultimate conclusion that HFC Blends and HFC Components are separate like products. See Pls.' Br. 7–24. Plaintiffs also contend that the ITC's findings as to four of the five prongs of its semi-finished products analysis were unreasonable or arbitrary when compared to prior agency decisions. Id. at 24–33. The court remands the Commission's Final Determination as to the "dedicated for use" and "value added" prongs for further reconsideration, and sustains the Final Determination as to all other challenges raised by Plaintiffs.

## A. Dedicated for Use

The first prong in the ITC's semi-finished products analysis is whether the upstream articles, HFC Components, are dedicated for use in the production of the downstream articles, HFC Blends. See Views at 14. Here, the ITC found that "consumption of domestically produced in-scope HFC components for the production of out-of-scope HFC blends and more than 30 out-of-scope refrigerants was not insignificant during the [period of investigation ("POI")]" ("dedicated for use finding"). Id. The ITC calculated that, during the POI, "[a]pproximately [X] percent[4] [("X percent figure")] of domestic production of in-scope HFC components was used in the production of out-of-scope refrigerant blends." Id.

Plaintiffs raise two challenges: (1) that the ITC's finding that HFC Components are not "dedicated for use" in the production of HFC Blends was unsupported by substantial evidence, and (2) that the ITC's dedicated for use finding was contrary to past practice.

---

[4] The X percent figure is [[    ]] percent.

See Pls.' Br. 12–17, 28–30; Pls.' Reply Br. 2–9. Plaintiffs argue that the ITC incorrectly attributes the X percent figure as representing the percentage of HFC Components used in out-of-scope blends, arguing that the ITC misread its own data and that the X percent figure describes "the ratio of in-scope to out-of-scope blends." Pls.' Br. at 12. Plaintiffs contend that the ITC's adoption of this ratio as a proxy for the proportion of HFC Components used in out-of-scope blends demonstrates that the "Commission thus misunderstood or misstated the extent to which HFC Components were dedicated to the production of HFC blends [sic]." Id. at 13. Plaintiffs argue that the Commission's determination resulted in an overstatement of the usage of HFC Components in out-of-scope blends. Id. at 12–15. Plaintiffs maintain that instead of relying upon the allegedly incorrect X percent figure as the estimate of in-scope components used to produce out-of-scope blends, the Commission should have selected the four percent figure put forth by Plaintiffs' witness at an ITC hearing. Id. at 12–15.

The ITC maintains that the adoption of the ratio of the production volume of out-of-scope blends to the volume of all total blends was a reasonable basis for estimating the approximate percentage of in-scope components used to produce out-of-scope blends. See Def.'s Resp. at 16–17. The ITC argues that the record demonstrates that the majority of out-of-scope blends contained at least one HFC Component. Id. The Commission emphasizes that it considers the totality of the facts and circumstances regarding its semi-finished products analysis and that the Commission's dedicated for use finding was not based solely on the X percent figure. Id. at 17–18. The ITC further contends that its finding is reasonable both as to its specific analysis on the dedicated for

use prong, and as to the semi-finished products analysis as a whole, based on the totality of the record. Id. Overall, the Commission maintains that it had competing data sets on the record from which it chose to "place more weight on the compiled questionnaire data in this case, rather than on an anecdotal estimate by one industry witness [proffered by Plaintiffs]." Id. at 17.

The Commission did not solely predicate its dedicated for use finding on the X percent figure. See Views at 14–15. In finding that "consumption of domestically produced in-scope HFC components for the production of out-of-scope HFC blends and more than 30 out-of-scope refrigerants was not insignificant during the POI," the Commission noted that two HFC Components had stand-alone end uses in addition to their uses as components. Id. This finding was limited, however, as the Commission highlighted the parties' agreement that "no more than [Y] percent[5] of in-scope HFC components are used as stand-alone products." Id.

The court agrees with Plaintiffs that it appears that the ITC incorrectly relied upon the X percent figure as the approximate percentage of HFC Components used in out-of-scope blends, and that this figure weighed significantly in the ITC's finding that HFC Components are not dedicated for use in the production of HFC Blends. The Views and Staff Report are unclear as to how much weight the ITC placed on this data and how it weighed the "dedicated for use" prong in comparison to the other four prongs in reaching the ultimate determination. Accordingly, the court will remand this issue to the ITC so that

---

[5] Y percent is [[  ]] percent.

the Commission may reconsider the use of the X percent figure and the weight assigned to this prong of its analysis.

Plaintiffs also argue that the ITC's dedicated for use finding was not in accordance with past practice. Specifically, Plaintiffs contend that the ITC's "dedicated for use" finding is tantamount to a requirement that 100 percent of components must be dedicated for use in order to satisfy this prong, given that the record demonstrates that over Z percent[6] of HFC Components are used to produce HFC Blends. See Pls.' Br. at 28–29. Plaintiffs maintain that the ITC has never set a 100 percent threshold for its dedicated to use analysis and that the use of that threshold in this action is contrary to the Commission's established precedent. Id. The Commission agrees with Plaintiffs that there is not a 100 percent threshold for the "dedicated for use" prong, and explains that it has never established any threshold percentage in evaluating this prong. Def.'s Resp. at 26. As to past practice, the ITC argues that prior ITC determinations do not provide much guidance for the agency's examination of the "dedicated for use" prong of its semi-finished products analysis given the fact-intensive nature of the inquiry. See Views at 19 n.62.

The court agrees with the ITC that it did not, as Plaintiffs contend, adopt a 100 percent threshold in considering whether HFC Components are dedicated for use in the production of HFC Blends. Rather the Commission based its "dedicated for use" finding on the record as a whole rather than a simple numerical threshold. See id. at 14, 18. Accordingly, the ITC reasonably explained the differences between this proceeding and

---

[6] Z percent is [[ ]] percent.

Court No. 16-00179                                                                                                    Page 10

its prior "dedicated for use" treatment.

## B. Differences in Value

In comparing the value of HFC Components with HFC Blends, the ITC found "[b]ased on reported financial data, the value added by blending operations of the integrated domestic producers ranged from A to B percent[7] during the POI, while the value added by [National Refrigerant's] blending operations ranged from C to D percent[8] during the period." Views at 16–17. Plaintiffs argue that in calculating the "value added" by blending, the ITC erred in its analysis in two respects. First, Plaintiffs contend that the ITC wrongly relied upon value added data that included costs and expenses associated with the manufacture of HFC Components, rather than the blending of HFC Components into Blends. See Pls.' Reply Br. at 9–10. Second, Plaintiffs maintain that the ITC's value added calculations wrongfully "included costs of cylinders, other packaging costs, and labor and overhead costs that were not related to blending operations," thus distorting the final value comparison. See Pls.' Br. 17–21; see also Pls.' Reply Br. 11–15. In addition to these substantial evidence challenges, Plaintiffs contend that the ITC's finding that there are significant differences in the value of HFC Components and Blends was contrary to prior ITC practice. See Pls.'s Br. 33; Pls.' Reply Br. 20–21. The ITC, however, maintains that its analysis of this prong was reasonable and should be sustained. See Def.'s Resp. 18–20.

Plaintiffs contend that the financial data relied upon by the Commission in

---

[7] The range of A to B is [[    ]] percent to [[    ]] percent.
[8] The range of C to D is [[    ]] to [[    ]] percent.

calculating the value added by blending operations of the integrated domestic producers was drastically overinflated and did not actually reflect the value added by blending HFC Components. See Pls.' Reply Br. at 9–10. Specifically, Plaintiffs argue that the data underlying the A to B range calculated by the ITC for the integrated producers improperly included significant labor and overhead costs incurred in the manufacture of components rather than in blending operations. Id. The Commission does not dispute this contention, but rather suggests that the data could serve as a sufficient approximation for the value added by the integrated producers for the purposes of ITC's broader consideration of semi-finished products analysis. See Transcript of Oral Argument at 70–71, ECF No. 67 (Jan. 10, 2018). Counsel for the ITC pointed out that even if the value added data for the integrated producers was improperly inflated, the value added data for National Refrigerants was also cited and relied upon by the ITC and contained no such flaws. Id.

Similar to the problem with the data set selection in the "dedicated for use" prong, the court agrees with Plaintiffs. It appears that the ITC relied upon the incorrect data in determining the A to B range as the approximate percentage of value added by the integrated producers in the blending of HFC Components into HFC Blends. The Views provide very limited discussion of how the ITC used this range, in conjunction with the value added data from National Refrigerants, in considering the "value added" prong and the ultimate separate like product determination. See Views at 16–17 (citing value added and average unit value data, without any comment on how that data influenced the separate like product determination and the subsidiary "value added" finding); see also id. at 18–19 ("Conclusion" section describing how each factor, except "value added",

supported the ITC's determination that HFC Components and Blends are separate like products). The <u>Views</u> and the <u>Staff Report</u> are unclear as to how much weight the ITC placed on these data points and how it weighed the "value added" prong in comparison to the other four prongs in reaching the ultimate determination. Accordingly, the court will remand so that the Commission may reconsider the use of the data in the A to B range and the weight assigned to this prong.

Plaintiffs also argue that the ITC included an overly broad set of "conversion costs" in its value added calculation. Plaintiffs seek to narrowly limit the "blending" process to include only the actual mixing of the HFC Components into a resultant HFC Blend, with no regard to any attendant or subsequent processes required to produce, transport, and maintain the final product. The court disagrees. The ITC requested and evaluated the full ambit of conversion costs incurred in transforming HFC Components into the final product of HFC Blends, including associated expenses for packaging. <u>See</u> Def.'s Resp. at 19–20 ("conversion costs (direct labor and other factory costs -- those costs associated with transforming a more basic product into a salable product) have been consistently treated by the Commission as the relevant numerator in the value added calculation"). Additionally, it appears from the record that Plaintiffs were well aware that the ITC viewed costs associated with blending operations broadly as including packaging costs and related overhead, but failed to object to the questionnaires' language with respect to this data or provide the ITC with a breakdown of their data that separated out these costs. The ITC's decision to consider the full set of data associated with the "conversion costs" of blending, including attendant costs covering the expense of packaging the HFC Blends

into cylinders suitable for storage and sale, is reasonable given the available data on the record for calculating the "value added" to HFC Components by blending them into HFC Blends.

Plaintiffs further argue that even if the Commission's evaluation of the "value added" prong is supported by substantial evidence, the Commission nevertheless acted contrary to prior ITC practice. Specifically, Plaintiffs contend that, by not finding HFC Blends and Components to be a single like product, the ITC departed from past practice in that it had previously found a single like product where the value of a component accounted for 50–70% of the final product's value. See Pls.' Br. at 33–34 (citing Outboard Engines from Japan, Inv. No. 731-TA-1069 (Final), USITC Pub. 3752 (Feb. 2005) at 6); Pls.' Reply Br. at 20–21. Plaintiffs maintain that a similar determination that components and blends are a single like product is appropriate in this action given that the Commission found that "the ratio of the average unit value of … subject HFC components to the average unit value of HFC blends ranged from [E to F] percent."[9] Views at 16.

The Commission distinguishes Outboard Engines from Japan, noting that, in that proceeding, "it determined a single like product, in part, based on its findings that there were significant differences in costs and values between the component and the finished product.… [A]lthough the component comprised a significant percentage of the value of the finished article, the Commission found that the upstream article (powerhead) had no separate market as it was internally consumed by the producer in the manufacture of

---

[9] The E to F range is from [[   ]] percent to [[   ]] percent.

another article." Def.'s Resp. at 30. Plaintiffs argue that the Commission's distinction is unavailing because it eliminates any difference between the Commission's consideration of the "dedicated for use" prong and the "value added" prong. See Pls.' Reply Br. at 20–21.

Given that the ITC may reasonably place more weight on the finding that there were independent uses and markets for the HFC Components, and give little weight to the finding that the total cost of HFC Components was a high percentage of the HFC Blends, the ITC's consideration of the "value added" prong did not deviate from past practice.

### C. Transformation of HFC Components into HFC Blends

The Commission evaluated the significance and the extent of processes used to transform HFC Components into Blends, and found that the "processes to transform the HFC components into HFC blends are not insubstantial." See Views at 17–18. Plaintiffs challenge this finding as unsupported by substantial evidence, raising similar arguments to those regarding the "value added" prong, namely, that the ITC's calculation of labor and other expenses involved in the blending and creation of HFC Blends was over-inclusive as compared with the production of HFC Components. See Pls.' Br. 21–24, 33–34; see also Pls.' Reply Br. 9–15, 20–21. The ITC maintains that it reasonably relied on industry questionnaire responses as to the costs and labor involved in the production of HFC Blends and Components separately. See Def.'s Resp. 20–25. This data included packaging and associated labor costs with respect to the production of both HFC Components and Blends. Id. at 21–23. Plaintiffs' arguments fail to convince the court that

the ITC unreasonably considered employee numbers or costs associated with blending operations too broadly.

With respect to the labor data, the ITC specifically "requested that the employee data be broken down by the number of employees involved in blending in-scope HFC components, out-of-scope R-134a, and in-scope HFC blends." Id. at 23 (citing to language from the producer questionnaire issued to Plaintiffs). The producers provided this data that covers "all aspects of both the component and blending production processes including the tasks required for the production, warehousing, and sale for components and blends separately." Id. On review of this data, the Commission determined that "[t]he processes to transform HFC components into HFC blends are not insubstantial." Views at 17. As the Commission explained, "[t]he blending process is not as capital intensive as the process to produce HFC components, and an HFC blending facility costs significantly less than an HFC component [production] facility…. Nevertheless, the production of HFC blends involves technical expertise and sophisticated equipment." Id. In making this finding, the Commission highlighted the facts that an HFC blender "must have a highly skilled workforce" and that "a higher number of production-related workers were involved in HFC blending operations than in the production of HFC components." Id. at 18.

Plaintiffs again seek to limit "blending" to refer only to the specific process of mixing the HFC Components to form HFC Blends. Plaintiffs' limitation, however, ignores the data conveying the broader costs associated with creating the HFC Blends as marketable products. The Commission's questionnaires requested a data set to provide a full picture

as to the magnitude and complexity of the processes of creating a final HFC Blend product from HFC Components. Therefore, the ITC acted reasonably in using this full dataset, rather than the limited and narrow data specifically relating to particular "blending operations" preferred by Plaintiffs. Accordingly, the court sustains the ITC's finding on this prong.

### D.  Separate Markets

Plaintiffs' sole challenge to the ITC's finding under the "separate markets" prong is that the Commission departed from its "well-established precedent" without explanation. See Pls.' Br. 25, 30–31. Specifically, Plaintiffs contend that "Commission practice permits finding a single market to encompass different stages of processing." Id. at 30. Plaintiffs argue that the Commission has "specifically rejected the argument that sale of parts to processors and sales of the finished product to distributors constitute separate markets." Id. at 31 (citing Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam, Inv. Nos. 701-TA-499- 500, 731-TA-1215-1217, and 1219-1223 (Final), USITC Pub. 4489 (Sept. 2014) at 10).

The Commission distinguishes the specific precedent relied upon by Plaintiffs, noting that in the determinations cited by Plaintiffs the Commission had found "no independent uses for the component parts…other than as part of the downstream article." Def.'s Resp. at 28. To the contrary, the ITC explains that "the record in the HFC investigation contained evidence of independent uses for the HFC components. That is, based on the facts and in particular market-specific questionnaire responses, the Commission reasonably found that there is an independent market for HFC components

separate and apart from the market for them to be used in finished HFC blends." Id. (citing Views at 14). Moreover, in the Views, the Commission distinguished the prior investigations cited by Plaintiffs on the facts. See Views at 19 (explaining that investigations cited by Plaintiffs were dissimilar to analysis of HFC Components and Blends, as cited investigations involved products where components were used exclusively to produce final product, or where component product was sold without further processing "it was sold to the same end users for the same applications as the downstream product").

Plaintiffs maintain that the Commission was overly simplistic in its analysis how HFC Components are sold to blenders for their eventual use in HFC Blends. See Pls.' Reply Br. at 17–18. Plaintiffs also note that the record established beyond dispute that any "independent uses" of HFC Components (i.e., uses other than for the production of HFC Blends) amounted to "no more than [Y] percent[10] of the consumption of components." Id. at 18. Plaintiffs contend that a mere Y percent for independent usage cannot constitute a "material difference" that should play into the Commission's evaluation of the markets in which HFC Components and Blends are sold. Id. While Plaintiffs would ignore the existence of a small market for independent uses of HFC Components, the Commission disagreed and found "meaningful distinctions" between the markets for HFC Blends and Components. Views at 19. The ITC explained that the evidence of the sales of HFC Components between integrated producers and independent blenders

---

[10] See explanation of Y, supra note 5.

Court No. 16-00179　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 18

indicated that "the markets for HFC blends and HFC components operate differently." Id. at 15. The court sustains the ITC's evaluation of the "separate markets" prong as reasonable.

### E.  Differences in Physical Characteristics and Functions

As with the previous prong, Plaintiffs' sole claim is that the Commission maintains a "generally consistent practice" as to the "differences in the physical characteristics and functions" prong and that the Commission erred by departing from its "well-established precedent" without explanation. See Pls.' Br. 25, 31–33. Specifically, Plaintiffs challenge the ITC's consideration of the HFC Components' physical characteristics with respect to each other and "without regard to the impact of those characteristics on the resulting HFC Blend." Id. at 32. Plaintiffs argue that the Commission's past practice in evaluating the physical characteristics prong of the semi-finished product analysis does not involve a comparison of the semi-finished components of finished goods against each other, but rather an evaluation of the physical characteristics of semi-finished components with a focus on "whether the components impart essential attributes to the finished product." Id. (citing prior ITC determinations concluding that essential components of finished goods may be semi-finished products within the same class as the finished product instead of separate like products).

The Commission explains that the ITC findings in prior investigations highlighted by Plaintiffs involve different industries and products and do not conflict with the ITC's findings in this investigation. See Views at 19 n.62; Def.'s Resp. at 29. In the ITC determinations cited by Plaintiffs, the semi-finished products/components "had no

independent function or use" other than as parts of the finished products; however, here, the ITC found that the HFC Components do in fact have independent uses other than as parts of finished HFC Blends. See Views at 19 n.62. In the court's view, Plaintiffs' reliance on prior ITC practice in these circumstances is misplaced.

Plaintiffs ignore the fact that the Commission emphasized significant differences between HFC Blends and HFC Components, finding that

> HFC components are used, in most cases, as intermediate products because such components are hazardous and, for two of the components, flammable (R-32 and R-143a). Accordingly, HFC components must be mixed together in prescribed ratios to make non-toxic, non-flammable HFC blends suitable for use as refrigerants in air conditioning and refrigeration applications. Thus, there are some significant differences in the physical characteristics of the upstream and downstream products.

Id. at 16; see also Staff Report at I-29 (detailing the "physical differences between the semifinished in-scope components and the downstream in-scope blends."). Accordingly, the court sustains the ITC's consideration of the "differences in the physical characteristics and functions" of HFC Components and HFC Blends as reasonable.

### III. Conclusion

Based on the foregoing, the Court remands the Commission's Final Determination for reconsideration of the "dedicated for use" and "value added" prongs of its semi-finished products analysis, and sustains the remaining portions of that analysis.

Accordingly, it is hereby

**ORDERED** that the Final Determination is sustained, with the exception of the Commission's dedicated for use and value added prongs of its semi-finished products

Court No. 16-00179                                                                                          Page 20

analysis; it is further

      **ORDERED** that the <u>Final Determination</u> is remanded to the Commission to reconsider the dedicated for use and value added prongs of its semi-finished products analysis; it is further

      **ORDERED** that the Commission shall file its remand results on or before April 18, 2018; and it is further

      **ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after the Commission files its remand results with the court.

                                                            /s/ Leo M. Gordon
                                                           Judge Leo M. Gordon

Dated: February 16, 2018
       New York, New York