Slip Op. 18 -153

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ARKEMA, INC., THE CHEMOURS COMPANY FC, LLC, HONEYWELL INTERNATIONAL INC., <br><br> Plaintiffs, <br> v. <br> UNITED STATES, <br><br> Defendant. | PUBLIC VERSION <br><br> Before: Leo M. Gordon, Judge <br><br> Court No. 16-00179 |

**OPINION and ORDER**

[ITC's Remand Results remanded.]

Dated: November 5, 2018

James R. Cannon, Jr. and Jonathan M. Zielinski, Cassidy Levy Kent (USA) LLP, of Washington, DC, for the Plaintiffs Arkema, Inc., The Chemours Company FC, LLC, Honeywell International Inc. and Plaintiff-Intervenors The American HFC Coalition, and its Members.

Patrick V. Gallagher, Jr., Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, for Defendant United States. With him on the brief were Dominic L. Bianchi, General Counsel, and Andrea C. Casson, Assistant General Counsel for Litigation.

Ned H. Marshak, Max F. Schutzman and Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for Defendant-Intervenors Shandong Dongyue Chemical Co. Ltd., Zhejiang Sanmei Chemical Ind. Co., Ltd., Sinochem Environmental Protection Chemicals Co., Ltd., and Zhejiang Quhua Fluor-Chemistry Co., Ltd.

Jarrod M. Goldfeder and Jonathan M. Freed, Trade Pacific PLLC, of Washington, DC, for Defendant-Intervenor National Refrigerants, Inc.

Gordon, Judge: This action involves the final affirmative material injury determination by the U.S. International Trade Commission ("ITC") in the antidumping duty

investigation covering hydrofluorocarbon ("HFC") blends and components from the People's Republic of China ("PRC"). See <u>Hydrofluorocarbon Blends and Components from China</u>, 81 Fed. Reg. 53,157 (Int'l Trade Comm'n Aug. 11, 2016) ("<u>Final Determination</u>"); see also <u>Views of the Commission</u>, USITC Pub. 4629, Inv. No. 731-TA-1279 (Final) (Aug. 2016), ECF No. 33-3 ("<u>Views</u>"); <u>ITC Staff Report</u>, Inv. No. 731-TA-1279 (July 8, 2016), as revised by Mem. INV-OO-062 (July 13, 2016), ECF Nos. 33-1 & 33-2 ("<u>Staff Report</u>").[1]

Before the court are the Views of the Commission on Remand, ECF No. 76 ("<u>Remand Results</u>") filed pursuant to <u>Arkema, Inc. v. United States</u>, 42 CIT ___, 290 F. Supp. 3d 1363 (2018) ("<u>Arkema I</u>"), as well as the comments of Plaintiffs Arkema, Inc., The Chemours Company FC, LLC, Honeywell International Inc. and Plaintiff-Intervenors The American HFC Coalition, and its members, (collectively, "Plaintiffs"). <u>See</u> Pls.' & Pl.-Intervenors' Remand Comments in Opp'n to the Comm'n's Remand Results, ECF No. 83 ("Pls.' Cmts"); <u>see also</u> Def.'s Resp. to Pls.' & Pl.-Intervenors' Remand Comments, ECF No. 86 ("Def.'s Resp."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

---

[1] All citations to the <u>Views</u>, <u>Remand Results</u>, the agency record, and the parties' briefs are to their confidential versions.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

In <u>Arkema I</u>, the court reviewed Plaintiffs' challenge to the ITC's application of its semi-finished products analysis to determine that HFC blends and HFC components are separate like products. See <u>Arkema I</u>, 42 CIT ___, 290 F. Supp. 3d 1363. The ITC's semi-finished products analysis examines "(1) whether the upstream article is dedicated to the production of the downstream article or has independent uses; (2) whether there are perceived to be separate markets for the upstream and downstream articles; (3) differences in the physical characteristics and functions of the upstream and downstream articles; (4) differences in the costs or value of the vertically differentiated articles; and (5) [the] significance and extent of the processes used to transform the upstream into the downstream articles." <u>Id.</u>, 42 CIT at ___, 290 F. Supp. 3d at 1368 (quoting <u>Views</u> at 14 n.40). The court sustained the ITC's conclusions for three of the five prongs—(2) separate markets, (3) differences in physical characteristics and functions, and (5) the significance and extent of transformation processes. <u>Id.</u>, 42 CIT at ___, 290 F. Supp. 3d at 1372–75. The court remanded the ITC's findings on the remaining two prongs: (1) dedicated for use and (4) differences in costs or value. Within those two prongs the ITC relied on certain data[3] that Plaintiffs demonstrated to be erroneously

---

[3] Specifically, for the dedicated for use prong, Plaintiffs demonstrated that the ITC relied upon an erroneously inflated estimate for the amount of in-scope HFC components used in the production of out-of-scope blends. <u>Arkema I</u>, 42 CIT at ___, 290 F. Supp. 3d at 1369–70. For the value added prong, Plaintiffs established that the ITC relied on data as to the value added to HFC components by integrated domestic producers in the production of HFC blends that erroneously inflated the value added by including "significant labor and overhead costs incurred in the manufacture of components rather than in blending operations." <u>Id.</u>, 42 CIT at ___, 290 F. Supp. 3d at 1371.

inflated. Id., 42 CIT at ___, 290 F. Supp. 3d at 1369–72.

On remand, the ITC corrected the inaccuracies, but maintained its conclusions that (1) there were "significant" differences in value supporting separate like product treatment for HFC components and HFC blends, and (2) HFC components were not dedicated for use as HFC blends. Plaintiffs challenge each of these decisions.[4]

## I. Standard of Review

The court sustains the ITC's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229

---

[4] In their comments, Plaintiffs argue that the ITC must identify "hard evidence" (whatever that that may be), for the Remand Results to be sustained. See Pls.' Cmts. at 2–3, 4, 7, 10. Plaintiffs misunderstand the substantial evidence standard of review. When the court reviews substantial evidence issues, the court does not evaluate whether record evidence is "hard" or "soft," it just evaluates whether the agency finding, conclusion, or determination is reasonable given the administrative record. See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).

(1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2018). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2018).

## II. Discussion

### A. Differences in Value

On remand the ITC again found that the cost/value prong of its semi-finished products analysis supported treating HFC components and HFC blends as separate like products. The ITC originally relied on incorrect data in determining the range of value added by the integrated producers. See Arkema I, 42 CIT at ___, 290 F. Supp. 3d at 1371. The ITC revised its original calculated range from [[    ]] to [[    ]] percent, to [[    ]] to [[    ]] percent, which was half as large as initially calculated.

The ITC also determined that the value added by transforming HFC components into HFC blends for both the integrated producers and the independent blender was "significant." Remand Results at 17. The court believes that the term "significant" is too vague in this context. The flip side of the blending value is the HFC component value,

which is [[         ]] percent, meaning HFC components are the predominant portion of HFC blends in terms of value. Given that predominance, the court is having difficulty sustaining as reasonable the ITC's mere conclusion that the comparatively smaller value added by blending is "significant." The court notes that the ITC's original overstatement of the blending value has the appearance of trying (perhaps too hard) to bolster the evidentiary basis for its decision.

　　　The ITC also emphasizes its reliance on the "significant differences in sales value between HFC components and HFC blends" found in the original determination. Id. at 17. "In the original determination, the Commission found that the ratio of the average unit value ('AUV') of domestic producers' U.S. commercial shipments of in-scope HFC components to the AUV of in-scope HFC blends ranged from [[    ]] to [[    ]] percent during the POI." Id. at 17–18 (citing Views at 16). Plaintiffs point out, persuasively, that AUV data is generally unhelpful for analyzing the differences in value or cost between HFC components and HFC blends. See Pls.' Cmts. at 9.

> The AUVs reflect the average net sales value of HFC Components per short ton and the average net sales value of shipments of HFC Blends. But, HFC Components were [[                              ]], whereas HFC Blends were [[                              ]]. Operating [[losses]] on the sale of HFC Components ranged from [[       ]] percent. By comparison, profits on sales of HFC Blends [[
>                              ]] percent. Therefore, comparing the AUVs, rather than cost of goods sold, is not an apples-to-apples comparison of the relative value of Components and Blends.

Id. (internal citations omitted). The ITC contends that Plaintiffs waived their arguments challenging the ITC's newly elevated and expanded reliance on the AUV data. See Def.'s

Resp. at 7 ("Plaintiffs did not previously challenge the ITC's use of AUVs in this litigation, nor did the Court direct the ITC to address this issue on remand."). The court disagrees. In its original determination, the ITC did not emphasize its AUV analysis:

> <u>Differences in Value</u>. During the POI, <u>the ratio of the average unit value of the U.S. industry's U.S. commercial shipments of subject HFC components to the average unit value of HFC blends ranged from [[　　]] percent to [[　　]] percent. Based on reported financial data</u>, the value added by blending operations of the integrated domestic producers ranged from [[　　]] percent to [[　　]] percent during the POI, while the value added by National's blending operations ranged from [[　　]] to [[　　]] percent during the period.

<u>Views</u> at 16–17 (emphasis added). The court remanded the value added analysis for the ITC to explain "how much weight the ITC placed on" the incorrect [[　　]] to [[　　]] percent data range, as well as how it weighed this prong in its ultimate separate like product determination. See <u>Arkema I</u>, 42 CIT at ___, 290 F. Supp. 3d at 1371. On remand, the ITC corrected its erroneous calculations for the integrated producers' value added data, and <u>elevated and expanded</u> its reliance upon the ratio of AUVs of in-scope components to in-scope blends. See <u>Remand Results</u> at 17–18 ("We find the difference between the AUVs of the HFC components and the HFC blends <u>to be significant</u>.") (emphasis added). Plaintiffs therefore may permissibly challenge this newly expanded rationale of the <u>Remand Results</u>. On the merits, Plaintiffs' arguments (quoted above) do test the reasonableness of the ITC's reliance on the differences between the AUVs of HFC blends and HFC components as the basis for its finding that there are "significant differences in value between HFC components and blends." <u>Remand Results</u> at 18.

## B. Dedication for Use

On remand, the ITC again found that HFC components were not dedicated for use in the production of HFC blends:

> **Dedicated for Use.** In the original investigation, the Commission found that "approximately [[　]] percent of domestic production of in-scope HFC components was used in the production of out-of-scope refrigerant blends during the POI." As discussed above, the Court remanded this issue so that "the Commission may reconsider the use of the [[　]] percent figure and the weight assigned" to this factor when making the domestic like product determination.
>
> As instructed, we have reconsidered our use of the [[　]] percent figure as a surrogate value to estimate the degree to which HFC components were used to produce out-of-scope refrigerants. We acknowledge the limitations of the data underlying the use of this figure as a surrogate, because it reflects some quantity of out-of-scope HFC blends that do not use in- scope HFC components. In addition, both in-scope and out-of-scope HFC blends underlying that figure are produced using variable quantities of in-scope HFC components and other out- of-scope components. Notwithstanding the limitations, which may result in this figure overstating to some extent the percentage of in-scope HFC components used to produce out- of-scope blends, we find that this figure continues to have probative value to our analysis, given the lack of more precise data in the record to enable a more rigorous calculation. Nevertheless, as discussed below, we have not relied on this figure or indeed on any specific number, wholly or even principally, in making our dedicated for use finding.
>
> The record, as a whole, indicates that the consumption of domestically produced in- scope HFC components for the production of out-of-scope HFC blends and refrigerants was not insignificant. As described in the Commission Report, questionnaire responses indicated that the out-of-scope blend production included 25 blends of HFC, hydrochlorofluorocarbon/chlorofluorocarbon ("HCFC/CFC"), and hydrofluoroolefin ("HFO") with 23 of 25 of these blends containing at least one in-scope HFC component, while other information in the record shows that there are at least 40 out-of-scope refrigerant blends containing at least one in-scope HFC component. Consequently, there are a significant number of uses for in-scope components beyond their use in the production of the five in- scope HFC blends.

   In addition, we find the data supplied by the responding HFC producers, notwithstanding its limitations, to be more probative of the extent to which in-scope HFC components were used in out-of-scope blends than the witness testimony the Petitioners argue the Commission should treat as dispositive. Petitioners' estimate that only four percent of HFC components are used to produce non-scope blends is the mere assertion of a witness at the preliminary phase conference -- before the bulk of material in the record was compiled -- that lacks any empirical basis discernible from the record.

   Finally, as we found in the original investigation, in-scope HFC components R-32 and R-125 have stand-alone end uses in addition to being used as components for refrigerants. Notably, R-125 has independent uses as a stand-alone refrigerant, as well as in a variety of other non-refrigerant applications, such as a blanketing gas for aluminum and magnesium casting, and in foam blowing, smelting operations, semiconductor silicon wafer processing, and certain medical applications. Similarly, R-32 can also be used as a stand-alone refrigerant in residential air conditioning systems and in semiconductor silicon wafer manufacturing.

   As we have explained above, we have not relied exclusively or even principally on the estimated [[　]] percent usage figure or any other specific empirical measure in reaching these remand results. Moreover, Petitioners' argument regarding the absence of record evidence concerning the volume of in-scope HFC components that may be contained in each HFC blend misses the point. The pertinent issue here is not whether the volume of in-scope HFC components is used principally to produce in-scope HFC blends, but whether the in-scope HFC components have appreciable uses other than in the production of in-scope HFC blends. Consequently, our analysis has focused upon the instances of use and the scope or breadth of the presence of HFC components in out-of-scope refrigerants and for other applications. We find the numerous uses for HFC components beyond their use in the production of in-scope HFC blends – namely in the production of out-of-scope refrigerants, for use as stand-alone refrigerants, and for uses independent of refrigeration – to be significant. Therefore, given the record data, we do not find that HFC components are dedicated for use in the production of HFC blends.

Remand Results at 13–16.

   There are a number of specific factual findings within the ITC's dedicated for use analysis that are unreasonable. Additionally, the ITC's overall rationale for this prong,

in the court's view, lacks logical coherence and is therefore not a reasoned decision that the court can sustain. To begin, the court cannot understand the ITC's explanation of its use and handling of the [[   ]] percent figure. In Arkema I, the court remanded the ITC's use of that figure because it appeared inaccurate. 42 CIT at ___, 290 F. Supp. 3d at 1369–70. In the Remand Results (quoted above) the ITC acknowledged that the figure was inaccurate, apparently from "limitations of the data . . . ." Remand Results at 13. Despite acknowledging that these flaws overstated "the percentage of in-scope HFC components used to produce out-of-scope blends," Remand Results at 13, the ITC nevertheless maintains that the data continues "to have probative value to our analysis," although apparently not enough to enable the ITC to determine a specific percentage. Id. at 13–14. To summarize, the ITC abandons use of the specific percentage because of flaws in the data, and then vaguely insists the data still has probative value, though it cannot be used to determine a specific measure of in-scope HFC components used to produce out-of-scope blends.

　　　　The ITC found "the data supplied by the responding HFC producers, notwithstanding its limitations, to be more probative of the extent to which in-scope HFC components were used in out-of-scope blends than the witness testimony the Petitioners argue the ITC should treat as dispositive." Remand Results at 14. The ITC explained its decision to prefer the flawed producer data over Plaintiffs' witness testimony by noting that the latter consisted of "the mere assertion of a witness at the preliminary phase conference -- before the bulk of material in the record was compiled -- that lacks any empirical basis discernible from the record." Id. These findings, however, are not

supported by the record. The relevant testimony was not presented "at the preliminary phase conference," but instead was provided in direct response to questioning at the final hearing. See Pls.' Cmts. at 5–6. The Global Business and Market Manager for Chemours testified under oath and was questioned directly by ITC Commissioner Broadbent about the reasons for selecting three HFC Components and five HFC Blends. Hearing Tr., PD[5] 138, at 53. The witness testified that the HFC components "are used almost exclusively in HFC blends." Id. at 54. She explained that "in-scope blends are taking account for 96 percent of the components that are in the case. The blends that are out-of-scope is literally 3 percent. And you've heard some people talk about the fire suppression market, and that's actually 1 percent of the use of those components." Id. at 56. At the earlier staff conference, the same witness testified that "there is essentially no direct market for the HFC components. They were created and exist today for the HFC blends market." Staff Conf. Tr., PD 25, at 28. Witnesses for Honeywell and Arkema both agreed with the witness' estimation of the portion of HCF components consumed in out-of-scope blends. Hearing Tr. at 55. The court could not identify on the record any sworn statements from other witnesses contradicting these statements. The Chemours witness also testified that "[w]e estimate that less than one percent of the sale of any of the components is used for something other than blends." Hearing Tr. at 26. The ITC agreed with her testimony on this point. See Views at 14–15.

    The court cannot understand how a reasonable mind would disregard this sworn

---

[5] "PD" refers to a document contained in the public administrative record, and "CD" refers to a document in the confidential administrative record.

testimony as "mere assertion" carrying less probative value than a flawed [[    ]] percent estimate from the producers' data, which inherently "overstates" the amount of in-scope HFC components used in out-of-scope blends. The ITC (or the producers who supplied the underlying data) will not hazard a guess by how much it is overstated, the ITC just assumes without explanation that it has more probative value than Plaintiffs' estimate.

This is not the only unreasonable aspect of the ITC's decision. The ITC states that "questionnaire responses indicated that the out-of-scope blend production included 25 blends … with 23 of 25 of these blends containing at least one in-scope HFC component, while other information in the record shows that there are at least 40 out-of-scope refrigerant blends containing at least one in-scope HFC component." Remand Results at 14. The ITC considered this "scope or breadth of the presence of HFC components in out-of-scope refrigerants and for other applications" as an indication that HFC components are not dedicated for use in the production of in-scope HFC blends. Remand Results at 15. Plaintiffs explain, however, that this "scope of breadth" is not as broad as the ITC imagines. See Pls.' Cmts. at 7. Plaintiffs clarify that the vast majority of out-of-scope blends allegedly containing in-scope components referenced by the ITC are not in fact manufactured or are only made in very small quantities. Id. The ITC's reference to "23 of 25" or "40 out-of-scope refrigerant blends containing at least one in-scope component" refers only to "blend formulas" that are registered with the American Society of Heating, Refrigeration, and Air Conditioning Engineers ("ASHRAE"), and provides no insight as to the actual volume of commercial production of out-of-scope blends containing in-scope components. Id. Plaintiffs also explain that a number of blends that

include HFC components registered with ASHRAE were not commercially produced, e.g., HFC Post-Conference Brief, CD 57, Ex. 4, and other blends were covered by patents but only produced in very small volumes. The ITC did not, therefore, have a sound handle on the actual "scope or breadth of the presence of HFC components in out-of-scope refrigerants and for other applications," Remand Results at 15, meaning that it must reconsider its finding that "there are a significant number of uses for in-scope components beyond their use in the production of the five in-scope HFC blends." Id. at 14.

The court also is having difficulty evaluating the reasonableness of the ITC's conclusions that out-of-scope uses of HFC components are "significant," "not insignificant," or "appreciable." Remand Results at 14, 15, 19. Recall that in Arkema I Plaintiffs argued that the ITC effectively required a 100 percent dedicated for use test, which the ITC denied. Arkema I, 42 CIT at ___, 290 F. Supp. 3d at 1370. In theory then at least, the ITC left open the possibility that other uses for an upstream product would not automatically disqualify the product (like HFC components) from being "dedicated for use" in the downstream, in-scope applications. That is fine in theory, but stickier in practice. In the Remand Results the ITC highlights that certain HFC components have "stand-alone end uses in addition to being used as components for refrigerants." Id. at 15 (explaining uses for R-125 and R-32 HFC components). These stand-alone end uses are one of the primary grounds for its finding that "the numerous uses for HFC components beyond their use in the production of in-scope HFC blends" are "significant." Id. At the same time, however, the ITC acknowledged that a very small percentage of HFC components are used as stand-alone products. See Arkema I, 42 CIT at ___,

290 F. Supp. 3d at 1370 (quoting Views at 14–15). The court is left wondering why exactly these uses are "significant"?

Similarly, although the ITC claims not to rely on the flawed [[  ]] percent figure "wholly or even principally" for its dedicated for use finding, the ITC nevertheless uses that figure to support its finding that the use of HFC components to produce out-of-scope blends is "significant." Remand Results at 15. Again, what exactly does the ITC mean by the term "significant" or "not insignificant"? Are these relative terms measuring out-of-scope use of HFC components against in-scope HFC blends? Or are these absolute terms that just measure the general use of HFC components in out-of-scope applications? Is the ITC concluding that the use of HFC components as standalone products are themselves "significant"? And if so, why does the ITC care about their relative use for in-scope applications and whether Plaintiffs' estimate is accurate that four, not [[9.3]], percent of HFC components go into the production of out-of-scope applications?

And what exactly does the ITC mean when it concludes that HFC components have "appreciable uses other than in the production of in-scope HFC blends"? Remand Results at 15. Is any commercial use of HFC components other than the production of in-scope blends, no matter how small relative to the principal in-scope blend use, appreciable? If so, this would seem to give credence to Plaintiffs' original contention that the ITC really is applying a de facto 100-percent threshold for its dedicated for use analysis, contrary to the ITC's position in Arkema I. See Arkema I, 42 CIT at ___, 290 F. Supp. 3d at 1370. Without a 100 percent dedicated for use test, Plaintiffs appear to have a good argument that their HFC components are dedicated for use as in-scope

HFC blends. They were created for HFC blends, are overwhelmingly used for in-scope applications, and constitute the predominant value of the in-scope HFC blends.

The court cannot, however, say (and direct by affirmative injunction) that HFC components must necessarily be the same like product as HFC blends for injury analysis under the trade laws. All the court concludes here is that the ITC has failed to reasonably explain its findings in the dedicated for use and differences in value prongs. The ITC, will therefore, again have to reconsider its semi-finished products analysis of HFC components and HFC blends. It may be helpful for the agency to resist using expedient, but vague, conclusory descriptors such as "appreciable," "significant," and "not insignificant," and to explain how it weighed the respective findings under each of the factors in its overall determination.

### III.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that the Remand Results are remanded to the ITC to reconsider the dedicated for use and value added prongs of its semi-finished products analysis, and if necessary, the ultimate conclusion; it is further

**ORDERED** that the ITC shall file its remand results on or before January 8, 2019; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after the ITC files its remand results with the court.

/s/ Leo M. Gordon  
Judge Leo M. Gordon

Dated: November 5, 2018  
      New York, New York